## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PRUDENTIAL INSURANCE COMPANY
OF AMERICA,
    *Plaintiff*,

    v.

JENNIFER KOWALSKI.,
    *Defendant.*

No. 3:21-cv-541 (VAB)

## RULING AND ORDER ON MOTION TO STRIKE AND REQUEST FOR SANCTIONS

Pending before the Court is Jennifer Kowalski's ("Defendant") Motion to Strike Proceedings, ECF No. 380 (June 21, 2024) ("Mot. to Strike"), as well as Prudential Insurance Company's ("Plaintiff" or "Prudential") request that the Court "hold Defendant in contempt and impose such sanctions as the Court deems appropriate until such time as Defendant provides the credentials and cooperates in multi-factor authentication to allow Epiq to search the three cloud-based storage sites for the inadvertently produced data and should award Prudential its reasonable counsel fees and costs incurred pursuing Defendant's compliance." Post-Hrg. Mem. of L. in Supp. of Mot. for Sanctions, ECF No. 379 (June 21, 2024) ("Post-Hrg. Mem."); *see also* Mem. of L. in Opp. to Def.'s Mot. to Strike Proceedings at 5, ECF No 381 (June 28, 2024) (Opp. to Mot. to Strike") ("Prudential respectfully submits that the Court should deny Defendant's Motion to Strike and grant the relief requested in Prudential's Post-Hearing Memorandum of Law in Support of its Motion for Sanctions.").

For the reasons that follow, Defendant's Motion to Strike is **DENIED**, and Plaintiff's Request for Sanctions is **GRANTED.**

By **August 9, 2024,** Ms. Kowalski shall provide Prudential, through its counsel[1], with the following: all required usernames, passwords, multi-factor identification and credentials (the "Credentials") so that Epiq can review Kowalski's Dropbox, Google Drive, and OneDrive locations in order to determine if any of the inadvertently produced data is located in those locations.

If compliance is not obtained by **August 9, 2024**, monetary sanctions will be imposed only for the costs of Prudential having to enforce the Court's Order through the May 8, 2024, and the June 3, 2024, hearings.

If by **August 9, 2024**, Ms. Kowalski has not complied, then Prudential shall submit the attorney's fees and costs associated with preparation for the May 8, 2024, and the June 3, 2024, hearings by **August 16, 2024**. *See Chambers v. NASCO, Inc*., 501 U.S. 32, 33 (1991) ("an exception allows federal courts to exercise their inherent power to assess such fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, as when the party practices a fraud upon the court, or delays or disrupts the litigation or hampers a court order's enforcement" (citations omitted)).

Any response to that submission by Ms. Kowalski shall be due by **August 23, 2024**. If she complies by August 23, 2024, the Court will consider whether to waive, or reduce any or all of Prudential's requested attorney's fees and costs. If Ms. Kowalski does not respond by **August**

---

[1] To the extent Ms. Kowalski is uncertain how to contact Prudential's counsel, the appropriate contact information is contained on the Court's docket for this case.

**23, 2024**, either by complying or in response to the motion for attorney's fees and costs, Prudential will have until **August 30, 2024** to file a reply.

If by the time of Prudential's reply due **August 30, 2024**, Ms. Kowalski has not complied, the Court will hold a final in person compliance hearing, at the U.S. District courthouse, 141 Church Street, New Haven, CT 06510, in Courtroom 2, on **September 3, 2024 at 9:00 a.m.** At that time, Ms. Kowalski will be asked in open court whether she will comply immediately. If she is not able to comply immediately at that final compliance hearing, she will be remanded to the custody of the U.S. Marshals, and confined civilly until she decides to comply.

## I.    BACKGROUND

The Court assumes familiarity with the factual and procedural background, and will only reiterate what is necessary to address the pending motion and requested relief. Specifically, the Court has been faced with Ms. Kowalski's continued failure to comply with its orders—requiring Ms. Kowalski to provide Epiq access to her cloud-based storage sites—for more than a year.

On April 10, 2023, U.S. Magistrate Judge Robert M. Spector, after holding a hearing, *see* Min. Entry, ECF No. 279,  issued an order giving Ms. Kowalski one week to provide the relief that Prudential still seeks today. *See* Order Granting in Part and Denying in Part Pl.'s Mot. to Compel, ECF No. 282 (Apr. 10, 2023) ("the motion to compel is GRANTED. The defendant shall provide Epiq access to her Dropbox, OneDrive, and Google Drive accounts by April 17, 2023. The motion for sanctions is DENIED without prejudice. The defendant is cautioned that any future failure to comply with this Order would likely result in the issuance of sanctions.").

On April 18, 2023, the Court "DENIE[D] any relief from the Orders of U.S. Magistrate Judge Robert M. Spector," Order deny Mot. to Stay, ECF No. 290 (Apr. 18, 2023) ("the Court adopts the report and recommendation of Judge Spector").

On April 21, 2023, the Court issued an order stating "Defendant must comply with Judge Spector's Order, which this Court has now adopted as well." Order Denying Mot. to Vacate, ECF No. 296 (Apr. 21, 2023) (citiations omitted).

On April 24, 2023, the Court again issued an order stating: "Defendant must comply with Judge Spector's Order, which this Court has now adopted as well." Order Denying Mot. to Vacate, ECF No. 298 (Apr. 24, 2023) (citations omitted).

On May 3, 2023, the Court issued an order after holding a hearing, *see* Min. Entry, ECF No. 302, stating that "As discussed at today's conference, Ms. Kowalski must comply with this Court's previous order. Consistent with these previous Orders, Ms. Kowalski specifically must provide Epiq access to her Dropbox, OneDrive, and Google Drive accounts, by May 5, 2023 at 5:00 p.m." Order, ECF No. 303 (May 3, 2023) (internal citations, emphasis and quotation marks omitted) ("While Ms. Kowalski as recently as todays hearing has continued to raise objections as to the nature of this and previous Orders, these arguments have been heard and rejected. At this point, compliance is required, and any further delay will not be tolerated, at least without the imposition of sanctions, as noted by this Court herein.").

On January 4, 2024, the Court granted Prudential's Motion for Sanctions. Order Granting Mot. for Sanctions, ECF No. 329 (Jan. 4, 2024) ("Ms. Kowalski shall be responsible for the reasonable expenses incurred by Prudential in seeking her compliance from May 5, 2023 until the date of this Order. . . . Any further failure to comply with this Courts previous Orders by Ms. Kowalski will result in the impositon of additional sanctions[.]").

On February 2, 2024, in response to a motion filed by Ms. Kowalski, *see* Mot. to Vacate, ECF No. 335 (Feb. 1, 2024), the Court issued an order stating that "Ms. Kowalski will be held financially liable for her refusal to comply with this Court's clear directives, and any continuing efforts also will be met with further financial sanctions. And to the extent the Court needs to take further actions to ensure compliance, if compliance is not obtained by March 1, 2024, the Court will consider and likely take any and all such actions within the scope of its authority." Order Denying Mot. to Vacate Order on Mot. for Sanctions, ECF No. 337 (Feb. 2, 2024) (citations omitted) ("Ms. Kowalski continues to make the same arguments this Court has rejected time and time again, regardless of how she tries to reframe them.").

On April 21, 2024, the Court ordered the parties to attend an in-person sanctions hearing. Order, ECF No. 346 (Apr. 21, 2024) ("At that hearing, the Court will determine what sanctions will be issued, and whether additional sanctions need to be imposed.").

On May 3, 2024, in response to a motion filed by Ms. Kowalski, *see* Mot. for Clarification, ECF No. 353 (May 2, 2024), the Court issued an order reiterating that it required "the parties to meet to clarify the Defendant's obligations, which the Defendant has suggested she lacks clarity on . . . To ensure that this meeting is successful, the Court has ordered — again, consistent with this Court's inherent authority — the parties to bring any electronic equipment necessary so that both parties can discuss with specificity the outstanding discovery that has been the subject of this Court's previous orders." Order on Mot. for Clarification, ECF No. 355 (May 3, 2024). In this Order, the Court noted "Defendant's continued failure to comply with previous court orders," "the considerable costs in attorney's fees at stake[,]" "and the amount of money that could be awarded in sanctions[.]" *Id.* ("As to what additional sanctions, the Court might

impose; any such decisions will be dependent on the degree to which Defendant continues not to comply, and what sanctions need to be imposed in order to ensure compliance.").

On May 6, 2024, the Court issued an order stating: "to the extent the Court determines that there is continued noncompliance, and compliance will only be accomplished through civil confinement, the Court will consider that option at or following the upcoming sanctions hearing." Order, ECF No. 356 (May 6, 2024).

On May 7, 2024, in response to a motion filed by Ms. Kowalski, *see* Second Mot. to Amend/Correct, ECF No. 357 (May 6, 2024), the Court issued an order stating that "the Court does not need nor will it entertain any more filings from Ms. Kowalski on the issue of compliance with the Court's numerous Orders, including but not limited to the Court's authority with respect to the possible imposition of sanctions." Order, ECF No. 358 (May 7, 2024).

On May 8, 2024, the Court held a sanctions hearing, *see* Min. Entry, ECF No. 365 (May 8, 2024), which it continued to include the taking of evidence. Order, ECF No. 362 (May 8, 2024) ("the parties are to present evidence, including but not limited to testimony, on the issue of Ms. Kowalski's access to the Plaintiff's information through any or all of the following accounts, either in February 2022 or any time before or since that date, on any Dropbox, OneDrive, or Google Drive account. To the extent that access to any of these accounts (on Dropbox, OneDrive, or Google Drive) requires muti-factor authentication, testimony or other evidence to that effect, and Ms. Kowalski's ability to obtain access to the accounts through that means also will be a proper topic of discussion at the upcoming hearing.").

On June 3, 2024, the Court held an evidentiary hearing. *See* Min. Entry, ECF No. 376 (June 3, 2024).

At the outset of the hearing, the Court stated that: "[W]e are here 'to present evidence, including but not limited to testimony on the issue of Miss Kowalski's access to the plaintiff's information through any and all of the following accounts either in February, 2022, or any time before or since that date, on any DropBox, OneDrive, or Google Drive account. [And,] to the extent that access to any of these accounts on DropBox, OneDrive, or Google Drive requires multifactorial authentication, testimony, or other evidence to that effect, and Miss Kowalski's ability to obtain access to the accounts that also means will be a proper topic of discussion at the upcoming hearing.' All right. So we are here for the upcoming hearing." Transcript of Evidentiary Hearing at 3:20–4:8, ECF No. 367 (May 28, 2024) ("Tr.") (quoting Order, ECF No. 362).

Counsel for the Plaintiff wanted to address some proposed exhibits with the Court, which he did, and Ms. Kowalski wanted to lodge objections to the exhibits. But the Court already had mooted any issues relating to any of her proposed objections. *See id.* at 12:18–13:5 ("[Plaintiff's counsel] has offered six exhibits, and what I have essentially said is either A, they fall into the category of being orders from the court, which is Exhibits 2, 3, and 4, which they don't need to be exhibits, because I can deal with them because they are orders from me . . . . [T]hen the second exhibits, leaving Exhibits 1, 5, and 6, all involve documents , or 6, involves videotaped depositions, which could come through testimony. . . . So, to the extent there are issues with them, you can take them up at that time.").

Counsel for the Plaintiff then proceeded to call his first witness, Ashraf Massoud. Ms. Kowalski objected to this witness because, in her view, the witness had not been disclosed. *Id.* at 13:9–10 ("Your honor, objection to the witness. Not a disclosed witness."). The Court explained that, "going over the transcript this morning, and if there was anything that was clear, it is what

[sic] this genteman was going to testify." *Id.* at 13:15–17. The Court then instructed the witness to take the stand. *Id.* at 13:19. Ms. Kowalski objected to the Court calling the witness to the stand. *Id.* at 13:20–21. The Court then admonished Ms. Kowalski. *Id.* at 13:22–23 ("Miss Kowalski, you will talk when I allow you to talk. Hold on.").

Ms. Kowalski objected to the Court's comments, and stated that the Court was "preventing [her] from making objections." *Id.* at 13:24–25. At that point, the Court admonished Ms. Kowalski again, and stated the following: "Stop, Miss Kowalski. If you continue to do that, we won't have a proceeding at all. I will hold you in contempt. And I will have the CSOs lock you up until you are ready to comply. Is that clear?" *Id.* at 14:1–4.

A member of the audience, later identified as Edward Kowalski, then shouted out: "You have got to be kidding me." *Id*. at 14:6. The Court then admonished this person: "Sir, if you don't stop, I will have you taken out of this courtroom." *Id*. at 14:7–8. The person tried to respond, and the Court interrupted him: "Sir, sir. That is the last time I will hear from you." *Id.* at 14:11–12. Ms. Kowalski then said that she was "lodging objections." *Id.* at 14:13. The Court made clear that someone from the audience "doesn't have a right to lodge objections." *Id.* at 14:14–15. The Court further noted that: "This is not a kangaroo court. I don't know what is going on here." *Id.* at 14:17–18. Ms. Kowalski tried to speak. *Id.* at 14:19. But before she could go on, the Court stated: "No, just listen to me. I need you to be quiet and listen, because what I hear is a lot of talking, but what I don't hear is a lot of listening. . . . I'm tired of the game playing. This is a serious proceeding." *Id.* at 14:20–24.

To further clarify the propriety of the first witness's testimony and to address any issues as to whether his appearance had been previously and properly provided to Ms. Kowalski, the Court cited from the record of a previous proceeding, specifically referencing the appearance of

Ashraf Massoud, the witness. *See id.* at 15:5–11 ("This is page 36 of the transcript, 'The magistrate order, which you adopted, it does directly quote a declaration of a man by the name of Ashraf Massoud, so that would be the person who I would request, since he is the person who has said these cloud sources were used, which the order is based upon.'" (quoting Transcript of Sanctions Hrg. at 36:3–8, ECF No. 367 (May 28, 2024))).

As the witness testified, Ms. Kowalski continued to object and interrupt the Court, in spite of the Court's warnings. The following colloquoy occurred bewteen Ms. Kowalski and the Court:

MS. KOWALSKI: Objection. Hearsay. This was submitted with a motion to compel. This is not expert testimony. Plaintiff has not disclosed this person as their designated expert.

THE COURT: Okay. Your objection, to the extent you are worrying about disclosure, again, as I read from your own statement, you were well aware back in May, at the previous hearing, that this gentleman would be appearing. So, the notion about no disclosure is – that argument is rejected.

MS. KOWALSKI: Your Honor –

THE COURT: Hang on. Hang on. Miss Kowalski, this is the last time I will tell you.

MS. KOWALSKI: That is not –

THE [COURT]: Miss Kowalski, I will not repeat myself.

MS. KOWALSKI: Your Honor.

Tr. 19:15–20:22.

After being warned a final time not to interrupt the Court, the Court held Ms. Kowalski in contempt. *See id.* at 20:7–22 ("THE COURT: Miss Kowalski. All right. Fine. Is that the way you

want to conduct it? All right. Here is what I'm going to do. I will hold you contempt. Court security officers, just take her into custody. When she is ready to actually conduct herself properly in this court, I will come back. All right. You guys are free. Thank you very much.").

Following the receess, the Court explained that it "had serious concerns about compliance by Miss Kowalski. . . . . and if there are continuing issues, I will deal with it as we go." *Id.* at 20:19–22. The Court further explained that "the Court took what, in its view, certainly, is an extraordinary action, mainly because it felt like it really had not much choice. I think there were repeated opportunities with the Court on the record, basically, asking Miss Kowalski not to interrupt the Court, but there was a continuing to do so almost in defiance of the Court's order. So, the issue is whether or not there is going to be compliance throughout the course of this proceeding. My hope is that there will be. My intention is to make sure we can get this testimony in. This person has come from out of state. We will get this testimony in and move forward . . . " *Id.* at 21:6–18.

After her return, the Court kept her in the custody of the U.S. Marshals until she affirmatively stated a willingness to comply with the Court's orders:

> THE COURT: . . . What I need to know, Miss Kowalski, are you able to comply with the court orders? I can have the marshals take the shackles off of you, and then we can take a recess to allow you to use the restroom. Are you able to comply with the court's order?
>
> MS. KOWALSKI: Sorry, what is the Court's order?
>
> THE COURT: The Court's order is – you were interrupting the Court and would not allow the Court to finish, and you thought you could sort of run roughshod over the

Court. I want to make sure that is not going to be repeated behavior as we continue this
hearing throughout the day.

MS. KOWALSKI: Yes, Your Honor. I just would like the opportunity to put objections
on docket. You are allowed to rule, of course, to overrule them in any way you would
like. I just had to lodge the objection.

THE COURT: No, I understand that. My specific question is: Are you able to follow
direction of the Court? Because I asked you not to speak over the Court and you kept
doing so. Are you able to follow the directions of the Court, yes or no?

MS. KOWALSKI: Respectfully, Your Honor, yes. You are not allowing me to put
objection on the record.

THE COURT: See, Miss Kowalski, look, I'm not playing a game. I'm asking you: Are
you able to follow the directions of the court? If you can, I can have the marshals take
you out of their custody? Are you able to follow the directions of the Court?

MS. KOWALSKI:  Yes, Your Honor.

THE COURT: Okay. The answer is yes. I will accept that answer. They will take you out
of custody, and we will take a 10-minute recess.

*Id.* at 41:14–42:21.

Although the Court did not hold Ms. Kowalski in contempt for the remainder of the
proceedings, she continued to try to obstruct the proceedings, by asking qustions already ruled
irrelevant and otherwise improper by the Court. *See*, *e.g.*, *id.* at 101:13–16 ("THE COURT: You
have asked that questiuon, and I gave the answer a few minutes. Come on. You are going around
in circles. Next question. If you have a new topic, let's go and ask the questions."); *id.* at 102:2–8
("THE COURT: You do know, because I told you. You can – you may decide you want to, you

know, disclaim the knowledge that I have done repeatedly both in writen orders and have done

orally as recently as today on more than one occasion, but that is fine. If you have nothing

further, you can sit down. You have any further questions for this witness.").

And when called to testify by Prudential, she argued that she could not be required to

testify because she had not been ordered to be there.

MR. WOLFSON: Your Honor, in the interest of time, we will call Miss Kowalski.

MS. KOWALSKI: Your Honor, I have not been subpoenaed, nor ordered to show here.

THE COURT: I just ordered you. And, actually, just to be clear, you know, again, this is

the game playing. Let's be clear.

MS. KOWALSKI:      Your Honor, there is an agreement between the parties.

THE COURT: Miss Kowalski, get in the witness box. Let me just be clear. I dealt with

this actually on Friday. I issued an order, because there were issues about subpoenas you

issud to people, and there was issues about you needing to postpone because you don't

know da-da, da-da. This is—this what I said in the order. "To the extent that it was not

clear previously, although there is no reason it should not have been, defendant, Jennifer

Kowalski, is ordered to appear at the June 3rd hearing and must be prepared to testify, to

the extent required to do so, and should be prepared to address the issues of compliance

with this Court's orders consistent with this Court's most recent order about the hearing,

362," which I have already repeated. So, I think i made it pretty clear. Get in the witness

box.

MS. KOWALSKI: Your Honor, my objection is it is not required to do so. They have not

disclosed me as a witness.

THE COURT: Miss Kowalski, you made the objections. I have ruled.

MS. KOWALSKI: I move for protection.

THE COURT: I understand. You object. I got it. Get in the witness stand.

MS. KOWALSKI: There is an agreement in place that conflicts with my ability to do so.

THE COURT: Well, you get in the witness stand. Get in the witness box and go ahead. Let's go. Miss Murphy?

THE CLERK: Please raise your right hand.

(Witness sworn).

*Id.* at 102:20–104:8.

Not long after her testimony began, the Court had to admonish Ms. Kowalski yet again about her conduct during the course of the proceedings.

MR. WOLFSON: Miss Kowalski, on that date, when you gave your testimony, you were under oath, correct?

MS. KOWALSKI: Yes, I was under oath, and just objection to being ordered to sit without counsel with less than 14 days noice. When counsel asked to withdraw by the magistrate judge, and he let them go voluntarily, I sat for the deposition without counsel. I recall it.

THE COURT: Hold on one second. Miss Ireland, would you read back the question she was asked.

THE COURT REPORTER: Miss Kowalski, on that date, when you gave your testimony, you were under oath, correct?

THE COURT: I will strike everything, other than she saying, yes, she was under oath. Everything else is nonresponsive. Next question.

MR. WOLFSON: Thank you.

THE COURT: Next question. That is what is going to happen continually. If you think it is funny – you think this is funny, Miss Kowalski? I don't think it is funny.

As you may have observed, this Court's busy. I did two criminal proceedings today, and I have a whole bunch of other matters, and you are playing games wih this Court. I already held you in contempt and put you in custody. That may be where this ends up. Let's see where this goes.

Go ahead, Mr. Wolfson.

*Id*. at 105:24–106:24.

Even after this admonishment – indeed, not long after the Court's last admonishment -- Ms. Kowalski continued to challenge the Court's authority to conduct the proceedings in an orderly fashion.

MR. WOLFSON: Ma'am, that was your answer at the time, was it not?

MS. KOWALKSKI: Objection. Compromised negotiation.

THE COURT: Yeah, the objection is overruled. I just want you to answer the question he asked you. Was the answer yes? Is that what your testimony was in that deposition? Is the answer yes?

MS. KOWALSKI: It is divested from the rest of the question.

THE COURT: Is your answer yes?

MS. KOWALSKI: There is no ---

THE COURT: Miss Kowalski, is the answer yes?

MS. KOWALSKI: There is no inadvertently produced data under the protective order.

THE COURT: That's fine. The answer is yes. Next question, Mr. Wolfson.

You want to play games? You know, this is absurd. Hang on for a moment. I have been

on the bench over nine years, and I have never had a witness or a party at all act as you

have acted, which has pushed the Court to have to do what it did not want to do but had

to do this morning. And what I have seen, is that even though the Court held you in

contempt earlier, you have no – still – no regard for the rules of this Court and its

procedure.

MS. KOWALSKI: Not true at all.

THE COURT: So, you are pushing the Court to do things it really does not wish to do

but, for whatever reason, you want to play these games, which the Court has said it is

repeatedly is tired of.

*Id.* at 107:25–109:4.

Nevertheless, Ms. Kowalski's efforts to obstruct the process continued.

Q:      And then line 14, "Right. Okay. So that is where I was headed next, after, and I

        think you clarified. So, since the time that those files were downloaded, that

        computer has been in your possession, and only your possession, with the

        potential exception of potentially, hypothetically, an expert, corect?"

        "Answer, That is 100 percent correct."

        That was your answer at the time, correct?

A:      Yes, it is. And at risk of being taken away, objection. Compromising a

        negotiation. There were settlement conversations, and I agreed to delete this at

        plaintifff's request because it was produced without a court order.

THE COURT: Next question.

*Id.* at 116:17–117:5.

During the proceeding, the evidence established the following:

Epiq, a litigation support company hired by attorneys to conduct do e-discovery work, *see id.* at 16:25–17:1, "initially imaged a laptop that was provided by Miss Kowalski . . . . " *Id.* at 23:14–19. Ms. Kowalski's credentials and cooperation with the authentication process were required, which she initially provided. *See id*. at 24:3–11 ("A. So, when we log in on behalf of an individual, the individual is sent a two-factor authentication code, usually to their phone, and we -- Epiq needs that. We need that code in order to log into the account and collect the data. Q. And, at that time, did Miss Kowalski provide you with the information necessary to image and work with those accounts and data? A. Yes, she did."); *see also id.* at 27:24–28:13 ("A. Whenever you have a Gmail account, you also have a Google Drive. That is an online, excuse me, online cloud storage capability that Google gives its customers, and so that just signifies that we collected Miss Kowalski's Google Drive data on that day. Q. And going two lines down, there is a reference to DropBox. Can you explain to the Court what that is? A. Yeah, very similar to Google Drive. It is anothercloud storage service provided by DropBox, and we collected it on that day. Q. For each of the Google Drive and DropBox accounts, were those the accounts you referenced earlier to the Court where you obtained credentials from Miss Kowalski in order to access those cloud-based sources? A. Yes, they are.").

During Epiq's work imaging and and working with Ms. Kowalski's accounts and data, "certain emails were inadvertently and mistakenly sent to Miss Kowalski and her counsel[.]" *Id.* at 28:15–19. This happened on two occasions, *id.* at 28:22–29:4 ("There were two occasions . . . There were two emails, I believe, that were sent with links to documents that could be downloaded that were sent to Miss Kowalski's attorney at that time, and I -- I believe to her as well."), and was investigated after it occurred, *id.* at 30:8–13 ("Q. Did you then look it into? A.

Yes. I did investigate that, yes. Q. Did you review the emails? A. I did. Q. To whom were the emails sent? A. They were sent to Alexa Millinger, I believe is her name, and Miss Kowalski.").

In the inadvertently-sent e-mails were links to two different files. *Id.* at 30:14–31:1 ("Q. What were the links embedded in those emails? A. They were links to different, two different files that dealt with a MacBook Pro data that was recovered and data recovered from a Microsoft Surface laptop, in addition to cell phone data . . . [collected] From the Surface laptop, from a MacBook Pro laptop, and from a cell phone.").

Around or after these e-mails were inadvertently sent, Epiq worked on a Dell laptop obtained from Ms. Kowalsk. *See* Tr. at 31:16–22. This Dell laptop had been searched for data that had been downloaded from the links in the e-mails, and files from those links were found in five locations on the laptop, including the downloaded folder, the desktop, and in the trash. *See id.* at 32:5–33:18.[2]

---

[2] The witness explained in detail Epiq's search to determine if anything from the links was downloaded onto the Dell laptop:

> Q. On what device was that work done?
> A. That is the Dell laptop that I just mentioned.
> Q. Great. Now, what work did Epiq do on that laptop with respect to any information relating to the previous inadvertently sent e-mails?
> A. Right. That laptop was searched for the data that came -- that was downloaded as a result of those links . . . So, I took the original data that was sent inadvertently, and in the forensic work we have what we call hash files. Every file has a unique 32-character alphanumeric number it to. It is a digital fingerprint. No two files can have the same number. That number is based on content, not on the file name, and it is designed to help us find data if -- just in case the file was renamed and tried to be hidden, we would still find the file based on this hash value. So, I created a hash library based on the three files that were inadvertently sent. That created a hash library of some 38,000 numbers, you know, entries, and applied that hash library to the computer to find where, if any, those were, if I got any hits based on the hash values of the files.
> Q. (Mr. Wolfson) Did you have any hits based on those hash values?
> A. I did, yes.
> Q. Explain to the Court what you found.
> A. So I found, I believe it was five locations, different locations on the computer where these files resided; downloaded folder, desktop, in the trash. I would have to revert to my declaration to get the exact path for the record, if you would like, but I found five paths with the data.
> Q. That was data contained in the links to the inadvertently produced email, right?

Ms. Kowalski's Dell laptop also had been searched to determine if the data that had been downloaded from these links in the inadvertently-sent e-mails had been transformed and/or transferred. *See id*. at 33:23–34:7 ("In addition to searching for the data that was inadvertently produced, did you also do further searches on the laptop to determine if the data was transformed in any way? A. Yes. Part of forensic analysis is to review, I think I mentioned earlier, things like USB history, was any USB plugged in, was data transferred to the USB device. We look at any internet history, was any email sent as an attachment, or were any cloud storage device sites accessed during this time.").

This search, including whether "any cloud storage device sites accessed during this time[,]" *see id*., revealed that Google Drive, DropBox, and OneDrive personal accounts by the name of Jennifer Kowalski were accessed. *See id*. at 36:11–37:19 ("you can see the part that is legible, or readable, human readable that was there was an –  there was authentication that occurred, and so somebody had logged into the DropBox account on that date and time. . . . What do those indicate, for all the remaining lines on the report? A. Sure. As with the other Google Drive and DropBox, OneDrive shows that a personal account by the name of Jennifer Kowalski on OneDrive was being accessed.").[3] But Epiq could not review the Google Drive, DropBox, or OneDrive accounts because without Ms. Kowalski's log-in credentials. *See id*. at 38:10–17 ("Q. Were you able to review the Google Drive, DropBox, or OneDrive accounts listed

---

A. Right. The links took you to a Zip file, and within the Zip file was all the other data once you unzipped it.

[3] The Witness testified that his search revealed that Jennifer Kowalski's Google Drive, DropBox, and OneDrive accounts were logged into, but he could not see what was in them. Tr. at 36:20–37:12 ("Once you log into an account, we can't see what is in the account. I just know you went there, and I know you logged in, but I don't know what is up there at the moment. There are some little snippets in the line, if you read through you will see .pdf, so perhaps things of a .pdf were reviewed, and you can draw those conclusions, but I really don't know what kind of document it is.").

on this report to determine if any of the inadvertently produced data was in those accounts? A. I was not. Q. Why not? A. I don't have the proper log-in credentials to access the account.").

All this was reiterated again on the record:

Q. (Mr. Wolfson) Sir, just to make sure we are all clear, the computer you are referencing, you found hash tags finding the inadvertently produced data on that, correct?

A. That is correct.

Q. And you were there after looking to see if the data was transferred anywhere?

A. Yes, that's correct.

Q. And you found these references to internet cloud-based sources, correct?

A. Correct.

Q. On the dates indicated on Plaintiff's Exhibit 9, correct?

A. Correct.

Q. And were you able to review those sources?

A. I was not.

Q. What do you need now to review those sources?

A. I need the defendant's email address associated with these accounts, the password, and eventually the two-factor authentication code that they will get when we try to log in.

*Id.* at 39:4–24.

Ms. Kowalski's previous testimony, despite her repeating that "there is no inadvertently produced data[,]" *id.* at 105:5–6, 108:12–13, 109:16, 110:25, and 121:22–23, corroborated the witness's testimony. At a deposition before the June 3, 2024 hearing, Ms. Kowalski had provided the following testimony:

Q. And I will read, beginning at line 5 thru line 12. "Question. All right. Miss Kowalski, I want to turn our attention to a different topic. During the course of this litigation, as you are aware, Epiq inadvertently sent not just spreadsheets but attachments that made their way to you. Do you understand what I'm referring to? "Answer. Yes." That was your testimony on that date, is it not?

A. That's my answer, yes.

. . .

Q. Beginning line 9, you were asked: "Question. But there were about two times where Epiq mistakenly, to your best recollection, I think it was only two, right? "Answer. Two or three."

*Id.* at 107:6–23.

On the witness stand at the June 3, 2024 hearing, Ms. Kowalski tried to avoid answering questions about the veracity of her previous testimony:

Q. After receiving those emails from Epiq, you downloaded some of the information to your computer, correct?

A. There is no inadvertently produced data in this case. I was not using my computer.

THE COURT: Is the answer yes or no? Did you download some of the information to your computer?

MS. KOWALSKI: I did not download inadvertently produced data.

THE COURT: I didn't ask about inadvertent. I'm not playing with loaded word games. Did you download information to your computer?

MS. KOWALSKI: Your Honor –

THE COURT: Yes or no, Miss Kowalski -- Miss Kowalski, yes or no?

MS. KOWALSKI: Was Facebook and LinkedIn sent to me? I'm concerned about data hacking. They are in my items, and I'm asking for protection to comply for four years is -- and be held like this, the Court knows I have medical issues as a result of this. There is no – no allegation has been made in this case in two and a half years.

THE COURT: You can keep going as long as you want, but I will get to the point I want to get to. You want to keep filibustering. I can stay here all night, and you can --

MS. KOWALSKI: I --

THE COURT: Hang on. You can stay in lockup until you decide to comply.

MS. KOWALSKI: That is fine, Your Honor.

THE COURT: You made your choice. Mr. Wolfson, ask the question again. Your exact question is after receiving those emails from Epiq you downloaded some information. Ask the question again.

Q. (Mr. Wolfson) Ma'am, after receiving those emails with the links from Epiq you downloaded some of those files onto a computer you were using, correct?

A. There is no inadvertently produced data in this case.

THE COURT: Did you download some of those files onto a computer? Is it a yes or no? Did you download --

MS. KOWALSKI: I can't answer that way, Your Honor.

THE COURT: You can answer the question. Leave the thing, inadvertent out. Did you download -- after receiving emails from Epiq, did you download some of the information that was contained in those emails from Epiq? Did you download it to a computer, yes or no?

MS. KOWALSKI: I can't answer the question divesting the noun from the verb.

THE COURT: Do your best to answer yes or no.

MS. KOWALSKI: Answering about -- without the, what the subject is disturbs the procedure of discovery rules.

THE COURT: This is my procedure. You are here in Court. What is fascinating is you have done this before, I'm so concerned about this procedure, but here you are, in a court, before a judge, and you really don't care what procedure I have. So, your argument that you care about procedure, really, has very little merit, just so you know. And just so the record is clear, if we want to make a record, because we are going to make a record --

MS. KOWALSKI: Your Honor, he is doing in-camera. Please --

THE COURT: I will ask the question to be responsive, and go ahead. Next question.

Q. (Mr. Wolfson) Ma'am, I will ask you to turn to page 166 again of the deposition transcript. Tell me whenyou are there

A. Yes.

Q. Beginning line 13, you were asked: "Okay. For our purposes, let's just call it those couple of times, okay. There were a couple where, after you received, not just a spreadsheet of file names, but further links to the computer files as well, right?" And you answered, "CSP text files, yes." Then the question was asked, "Did you download any of those CSP text files?" "Answer. Yes. The link download to my computer is my understanding." That was your answer to those questions at that time, correct?

A. I don't know what a CSP is. . .

. . .

Q. "Question. Are those" -- and I will ignore the words CSP -- "text files that were downloaded still on the computer?" And you answered "Yes," correct?

A. That's correct.

*Id.* at 109:13–116:4.

Finally, near of the end of her direct examination Ms. Kowalski stated the following: "I cannot give keys to this information for my adversary's direct acccess." *Id*. at 123:13–14.

Following the June 3, 2024 hearing, Prudential filed a memorandum requesting that the Court "enter an Order again requiring [Ms. Kowalski] to provide all required usernames, passwords, multi-factor identification and credentials (the "Credentials") so that Epiq can review Kowalski's Dropbox, Google Drive, and OneDrive locations in order to determine if any of the inadvertently produced data is located in those locations, as well as awarding Prudential its attorneys' fees and costs incurred pursuing its Motion for Sanctions." Post-Hrg. Mem. at 1.

On June 21, 2024, Ms. Kowalski filed her pending motion to strike, moving "to strike the June 3, 2024 evidentiary proceeding including, inter alia, all testimony and evidence[.]" Mot. to Strike at 1.

On June 28, 2024, Prudential filed an opposition to the motion to strike. *See* Opp. to Mot. to Strike.

## II.   STANDARD OF REVIEW

Sanctions can be imposed either under Rule 37 or under a court's inherent authority, or both.

> Federal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them. In invoking the inherent power to punish conduct which abuses the judicial process, a court must exercise discretion in fashioning an appropriate sanction, which may range from dismissal of a lawsuit to an assessment of attorney's fees. Although the "American Rule" prohibits the shifting of attorney's fees in most cases, an exception allows federal courts to exercise their inherent power to assess such fees as a sanction when a party has acted in

> bad faith, vexatiously, wantonly, or for oppressive reasons, as when the party practices a fraud upon the court, or delays or disrupts the litigation or hampers a court order's enforcement.

*Chambers*, 501 U.S. at 33 (citations omitted). If not imposed under Rule 37, courts need to find bad faith before imposing sanctions. *See Hart v. Suffolk Cnty.*, No. 17-CV-05067 (LGD), 2023 WL 5720075, at *8 (E.D.N.Y. Sept. 5, 2023) ("'[C]lear and convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power." In addition, 'the Supreme Court has made clear that courts should impose sanctions pursuant to their inherent authority only in rare circumstances.'") (quoting *Chambers*, 501 U.S. at 44).

Under Rule 37, four factors are considered when imposing sanctions, particularly the sanction of case dismissal. Fed. R. Civ. P. 37(2)(A) (Sanctions for not obeying a discovery order may include "(v) dismissing the action in whole or in part; . . . (vii) treating as contempt of court failure to obey an order except an order to submit to a physical or mental examination.").

> We have indicated that "[s]everal factors may be useful in evaluating a district court's exercise of discretion" to impose sanctions pursuant to this rule [37], including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." Because the text of the rule requires only that the district court's orders be "just," however, and because the district court has "wide discretion in imposing sanctions under Rule 37," these factors are not exclusive, and they need not each be resolved against the party challenging the district court's sanctions for us to conclude that those sanctions were within the court's discretion.
>
> . . .
>
> With respect to the district court's July 2007 order holding Global in civil contempt, the district courts have the inherent power to find a party in contempt for bad faith conduct violating the court's orders "even if procedural rules exist which sanction the same conduct." Whether imposed pursuant to Rule 37 or the court's inherent power, a contempt order is, we have recognized, a "potent weapon, to which

> courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." A court may, however, hold a party in contempt for violation of a court order when "the order violated by the contemnor is clear and unambiguous, the proof of non-compliance is clear and convincing, and the contemnor was not reasonably diligent in attempting to comply."

*S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144–45 (2d Cir. 2010) (internal citations omitted).

## III.  DISCUSSION

Courts have broad and discretionary authority to fashion sanctions for failure to comply with discovery orders.

> "[D]iscovery orders are meant to be followed," *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995), and "[a] party who flouts such orders does so at his peril," *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988); *see also Agiwal v. Mid Island Mortgage Corp.* 555 F.3d 298, 302 (2d Cir. 2009).

*Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 177 (D. Conn. 2010); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction[.]").

Courts also have authority to order incarceration for civil contempt. "Congress also specifically authorized indefinite, coercive civil confinement." *Armstrong v. Guccione*, 470 F.3d 89, 105 (2d Cir. 2006). In *Armstrong*, the Second Circuit upheld civil confinement that had lasted seven (7) years—and remained indefinite—for failure to comply with orders to turn over records and assets. *See id*. at 95 (finding the district court had not abused its discretion when it "found Armstrong in contempt for failing to turn over the missing records and assets. The court directed the marshals to confine Armstrong at the Metropolitan Correctional Center ("MCC") until he

either complied with the turnover orders or demonstrated that it would be impossible for him to

do so. Since January 14, 2000, Armstrong has remained confined at the MCC. The district court

has conducted periodic hearings to ensure that Armstrong's detention remains coercive rather

than punitive. In furtherance of this end, the district court has provided Armstrong with

numerous opportunities to either comply with the orders or demonstrate that it would be

impossible for him to do so.").

Under 18 U.S.C. § 401,[4] "[t]he chief characteristic of civil contempt is . . . to compel

obedience to an order of the court to enforce the rights of the other party to the action. Consistent

with this remedial purpose, the sanction imposed is generally made contingent on compliance.

This is often accomplished by a purgation provision, whereby a civil contemnor may purge

himself of contempt at any time by compliance." *Armstrong*, 470 F.3d at 100–08 ("In

establishing the lower federal courts, Congress vested in them the inherent power to order

coercive civil confinement."); s*ee also Charter Pracs., Int'l, LLC v. Robb*, No. 3:12-CV-1768

(RNC), 2013 WL 12178172, at *3 (D. Conn. May 22, 2013) ("When a district court's order has

been violated, the court may impose either civil contempt remedies or criminal contempt

sanctions, or both." (quoting S.*E.C. v. American Bd. of Trade, Inc*., 830 F.2d 431, 439 (2d Cir.

1987))); *Benthos Master Fund, Ltd. v. Etra*, No. 20-CV-3384 (VEC), 2023 WL 4350594, at *3

(S.D.N.Y. July 5, 2023) ("The Court found Etra in civil contempt for failing to produce

documents as ordered and remanded him into the custody of U.S. Marshals. Later that day, the

Court ordered Etra released from custody subject to his commitment to comply with a document

---

[4] Section 401 provides:

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as -
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
(2) Misbehavior of any of its officers in their official transactions;
(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

production schedule." (citations omitted)).

Ms. Kowalski argues that "the judiciary acted with flagrant disregard for the rules of procedure and evidence. Whether purposefully or not, the court's unjustified imprisonment of Ms. Kowalski during the pendency of a civil proceeding, was an egregious and brutish misuse of judicial power that both coerced and altered Ms. Kowalski s behavior, testimony and self-representation. Ms. Kowalski is intimidated – physically and emotionally – by the oppressive conduct and moves to strike the proceedings and review the conduct of the bench." Mot. to Strike at 1. Ms. Kowalski argues that the hearing "was scheduled without adequate notice or procedural fairness, including any advance disclosure of witnesses nor evidence. The hearing was after the court had already granted Plaintiff motion for fees and costs." *Id.* at 2 (citation omitted).

In response, Prudential argues that "there is no basis in fact or law for Defendant's unsupported allegations, which are an affront to the Court's inherent authority, and is nothing more than another effort by Defendant to reject this Court's Orders and directives." Opp. to Mot. to Strike at 1. Prudential argues that "in an attempt to justify her frivolous allegations, Defendant misrepresents and mischaracterizes the reasons for which the Court scheduled the hearing on June 3, 2024." *Id.* Prudential describes how "the June 3 Hearing was scheduled for a specific, and limited, purpose 'to present evidence, including but not limited to testimony, on the issue of Ms. Kowalski's access to the Plaintiff's information through any or all of the following accounts, either in February 2022 or any time before or since that date, on any Dropbox, OneDrive, or Google Drive account. To the extent that access to any of those accounts (on Dropbox, OneDrive, or Google Drive) requires multi-factor authentication, testimony or other evidence to that effect, and Ms. Kowalski' ability to obtain access to the accounts through that means also

will be a proper topic of discussion at the hearing.'" *Id.* at 2 (citing Order, ECF No. 362 (May 8, 2024)).

Prudential further argues that the Order leaves "no dispute that the parties were aware of the scope of the testimony to be introduced at the June 3 Hearing and that the evidence sought by the Court was related to the pending motion for sanctions." *Id.* (citation omitted). Prudential also details how "Defendant's conduct at the June 3 Hearing is not the first occasion on which Defendant willfully and blatantly refused to comply with the Court's Orders and rejected the Court's authority." *Id.* at 3 (citing ECF Nos. 282, 291, 296, 298, 303, 307, 309, 329, 337). "Indeed, Defendant had already been held in contempt by the Court and had sanctions imposed against her, (ECF 329), had been advised by the Court that continued refusal to comply with Court orders could result in civil confinement, (ECF 356), and was specifically told by the Court at the May 8 Hearing that the Court 'has a host of range of options, including civil confinement, which the Court will not hesitate to use if it believes it is appropriate,' (Transcript of May 8, 2024 Court Hearing, at 11). In addition, Defendant was specifically advised by the Court at the June 3 Hearing that if she continued her improper behavior she would be held in contempt and confined until she agreed to comply. (Transcript of June 3 Hearing, at 14). Defendant, therefore, was repeatedly placed on notice of the repercussions of her conduct." *Id.*

The Court agrees.

Ms. Kowalski's arguments and representations are not supported by the record. Rather, the record is clear that for more than a year leading up to the June 3, 2024, hearing, and based on the evidence proffered at that proceeding, that Ms. Kowalski knows what is required to comply with this Court's orders, but has refused—to this point—to do so. *See*, *e.g.*, Order denying Mot. to Vacate Order on Mot. for Sanctions, ECF No. 337 (Feb. 2, 2024); Order Granting Mot. for

Sanctions, ECF No. 329 (Jan. 4, 2024); Order, ECF No. 303 (May 3, 2023); Order, ECF No. 307 (May 25, 2024); Order, ECF No. 309 (May 31, 2023); Order Granting in Part and Denying in Part Pl.'s Mot. to Compel, ECF No. 282 (Apr. 10, 2023), Order Denying Mot. to Vacate, ECF No. 296 (Apr. 21, 2023); Order Denying Mot. to Vacate, ECF No. 298 (Apr. 24, 2023); Order denying Mot. to Vacate Order on Mot. for Sanctions, ECF No. 337 (Feb. 2, 2024) ("Ms. Kowalski will be held financially liable for her refusal to comply with this Court's clear directives"); Order Granting Mot. for Sanctions, ECF No. 329 (Jan. 4, 2024); Order, ECF No. 303 (May 3, 2023) ("[I]f compliance continues to be an issue, the Court will not hesitate to consider the imposition of 'other appropriate sanctions,' as provided by the Federal Rules of Civil Procedure, in addition to any monetary sanctions. While Ms. Kowalski as recently as today[']s hearing has continued to raise objections as to the nature of this and previous Orders, these arguments have been heard and rejected. At this point, compliance is required, and any further delay will not be tolerated, at least without the imposition of sanctions, as noted by this Court herein.") (citing Fed. R. Civ. P. 37(a)(5)) (internal citations omitted).

These orders all require Ms. Kowalski to do a very straightforward thing: provide her credentials and cooperate in the required multi-factor authentication to allow Epiq to search her Dropbox, Google Drive, and OneDrive to determine if any of the inadvertently produced data is located in those locations. This is no different from the Court's order more than one year ago. *See* Order Granting in Part and Denying in Part Pl.'s Mot. to Compel, ECF No. 282 (Apr. 10, 2023) ("the motion to compel is GRANTED. The defendant shall provide Epiq access to her Dropbox, OneDrive, and Google Drive accounts by April 17, 2023.").

Moreover, as a result of the most recent hearing, there is no question as to what precisely is being requested of Ms. Kowalski, and that Ms. Kowalski can comply with this order. The testimony

showed that Ms. Kowalski knows what the Court is ordering her to do, but just wants to avoid doing it. *See* Tr. at 39:18–24 ("Q. What do you need now to review those sources? A. I need the defendant's email address associated with these accounts, the password, and eventually the two-factor authentication code that they will get when we try to log in); *id.* at 123:13–14 ([MS. KOWALSKI:] "I cannot give keys to this information for my adversary's direct access.").

As a result, whether Ms. Kowalski chooses to follow the Court's Orders, including the one to be issued here, is within her control**.** *See, e.g., Pal v. Canepari*, No. 3:20-CV-00013 (MPS), 2021 WL 8323639, at *10 (D. Conn. Mar. 15, 2021), *report and recommendation adopted*, No. 3:20-CV-13(MPS), 2021 WL 8362143 (D. Conn. May 27, 2021) ("Finally, the plaintiff's noncompliance was not due to factors beyond her control. She has had several months and many opportunities to produce the unrestricted authorizations. Instead, she decided to file numerous objections and motions, repeatedly asserting the same arguments on why she should not be required to produce the authorizations."); *see also Musgrave v. Wolf*, 136 F. App'x 422, 424 (2d Cir. 2005) (summary order) (recognizing that party's conduct was willful and justified the imposition of sanctions, stating that her "consistent attitude . . . that no determination of the Magistrate Judge or the District Court was decisive or binding, that every issue in the case was open to continual review on the same repeated grounds, and that she was entitled to suspend court discovery orders simply by appealing them repeatedly . . . reflected a refusal to recognize the court's.").

Additionally, based on this record, there are ample reasons for this Court to find bad faith on Ms. Kowalski's part in refusing to comply with this Court's discovery orders. To find bad faith, "a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brough in bad faith, i.e., motivated by improper purposes such a harassment or

delay." *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 338 (2d Cir. 1999) (citations

omitted). "[B]ad faith may be found, not only in the actions that led to the lawsuit, but also in the

conduct of the litigation." *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986), *cert denied*,

480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). This Court's bad faith finding relates to

"the conduct of the litigation": Ms. Kowalksi's steadfast refusal to provide the discovery

information ordered by the Court for over a year now, and for the protracted proceedings

necessary to clarify that she clearly understood this obligation.

As to the first prong, the colorability of Ms. Kowalski's efforts to delay these

proceedings, "a claim lacks a colorable basis when it is utterly devoid of a legal or factual basis."

*Schlaifer Nance & Co.*, 194 F.3d at 337. Since April 10, 2023, Ms. Kowalski has known what

she has to do to comply with the outstanding discovery order. *See* Ruling on Plaintiff's Motion to

Compel the Defendant to Comply with the Court's Orders and For Sanctions, ECF No. 282, at 4

("[A]ny possible confusion created by the Deletion Order was certainly resolved by the court's

October 14, 2022, in which the Court specifically order [sic] Kowalski to turn over her

credentials to all sources where the inadvertently produced data may reside. **Accordingly,**

**Prudential's Motion to Compel is GRANTED. Kowalski shall provide Epiq access to her**

**Dropbox. OneDrive, and Google Drive accounts by April 17, 2023.")** (emphasis in original).

Since that time, Ms. Kowalski has presented no legal or factual argument of merit justifying her

continued refusal to comply with the April 10, 2023 Order and every subsequent one to provide

the requested information. *See*, *e.g.,* Stated Objections In Support of Notice of Appeal For Relief

From NonDispositive Pretrial Magistrate Order 278, ECF No. 293.[5]

---

[5] Significantly, in this filing, Ms. Kowalski relies on a single case to justify not complying with the Court's orders:
*Crosmun v. Trustees of Fayetteville Tech. Cmty. Coll.*, 832 S.E.2d 223, 2019 WL 355874 (N.C. Ct. App. Aug. 6,

As to the second prong, bad faith, "[b]ad faith can be inferred when the actions taken are 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose.'" *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 338 (2d Cir. 1999) (quoting *New York v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir. 1996)). Since the April 17, 2023 Order, there have been numerous efforts—and chances—for Ms. Kowalski to comply with the Court's orders and she instead has unjustifiably forced both a Magistrate Judge and a District Judge to engage in multiple proceedings, and to endure various dilatory tactics to avoid acknowledging that she knew what was expected of her. One example—of the many examples in the record—is her refusal to testify, and denial of any knowledge of having been asked both to appear and testify: "Your Honor, I have not been subpoenaed, nor ordered to show here." Tr. at 102:24–24.

But she had been ordered to be there, and testify, in an express order by the Court, days before the hearing: "To the extent that it was not clear previously—although there is no reason it should not have been—Defendant, Jennifer Kowalski, is ordered to appear at the June 3rd hearing, and must be prepared to testify, to the extent required to do so, and should be prepared

---

2019). But that case does not support her position. First, it is a state court ruling not binding on this Court. Second, and more importantly, it does not stand for the far-reaching principle relied on by Ms. Kowalski. That case reversed and remanded a state trial court discovery order because the discovery protocol and related protective order did not sufficiently protect the rights of one of the parties under North Carolina law, and presented a problem not present in federal courts. *See id.* at 235 ("Federal district courts may turn to Rule 502(d) of the Federal Rules of Evidence to resolve the [issue of the inadvertent production of privileged information], which expressly permits '[a] federal court [to] order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court – in which event the disclosure is also is not a waiver in any other federal or state proceeding. North Carolina's Rules of Evidence and Rules of Civil Procedure contain no such direct analog."). In any event, even in that case, that North Carolina appellate court did not prevent discovery, but only wanted to make sure any discovery protected all rights. And, consistent with what was recognized in Ms. Kowalski's sole basis for legal support for her extreme—and legally untenable—position, this Court has ample authority to ensure that no rights are waived by her providing the required access clearly sought since April 17, 2023. *See, e.g.*, Fed. R. Civ. P. 26(c)(1) ("A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . ."); *see also Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases.").

to address the issues of compliance with this Court's Orders[.]" Order, ECF No. 373 (May 31, 2024) at 2.

Nevertheless, even after being reminded of this previous order, Ms. Kowalski still claimed that there was no basis for her having to testify: "Your Honor, my objection is it is not required to do so. They have not disclosed me as a witness." *Id.* at 103:19–21. Having previously been ordered to testify, and then reminded that she had been ordered to testify, her actions were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Schlaifer Nance & Co.*, 194 F.3d at 338 (citation and internal quotation marks omitted); *see DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998) ("the Magistrate Judge made a finding that defendants had acted in 'conscious disregard of their discovery obligations.' We deem these findings to be sufficiently concise and based on clear evidence so as to amount to the bad faith required to impose sanctions. Indeed, the record reflects a pattern of behavior which could reasonably be construed as a bad faith effort to thwart plaintiffs' discovery efforts." (citations omitted)); *see also S.E.C. v. Smith*, 710 F.3d 87, 98 (2d Cir. 2013) ("Indeed, the record carries a circumstantial stench that only heroic credibility findings in her favor would dissipate.").

Accordingly, Ms. Kowalski must now comply with the Court's repeated orders or face sanctions, including as further detailed, if necessary, civil confinement. *See Armstrong*, 470 F.3d at 101 ("The chief characteristic of civil contempt is that its purpose is to compel obedience to an order of the court to enforce the rights of the other party to the action. Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance. This is often accomplished by a purgation provision, whereby a civil contemnor may purge himself of contempt at any time by compliance." (quoting *In re Irving*, 600 F.2d 1027, 1031 (2d Cir.

1979))); *see also Aliki Foods*, 726 F. Supp. 2d at 177 ("[D]iscovery orders are meant to be followed, and [a] party who flouts such orders does so at his peril," (internal citations and quotation marks omitted)).

### IV.  CONCLUSION

For the reasons stated above, Defendant's Motion to Strike is **DENIED**, and Plaintiff's Request for Sanctions is **GRANTED.**

By **August 9, 2024,** Ms. Kowalski shall provide Prudential, through its counsel,[6] with the following: all required usernames, passwords, multi-factor identification and credentials (the "Credentials") so that Epiq can review Kowalski's Dropbox, Google Drive, and OneDrive locations in order to determine if any of the inadvertently produced data is located in those locations .

If compliance is not obtained by **August 9, 2024**, monetary sanctions will be imposed only for the costs of Prudential having to enforce the Court's Order through the May 8, 2024, and the June 3, 2024, hearings.

If by **August 9, 2024**, Ms. Kowalski has not complied, then Prudential shall submit the attorney's fees and costs associated with preparation for the May 8, 2024, and the June 3, 2024, hearings by **August 16, 2024**. *See Chambers*, 501 U.S. at 33 ("an exception allows federal courts to exercise their inherent power to assess such fees as a sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, as when the party practices a fraud upon the court, or delays or disrupts the litigation or hampers a court order's enforcement" (citations omitted)).

---

[6] As noted at the outset, to the extent that Ms. Kowalski is uncertain of how to contact Prudential's counsel, she may obtain that information from the Court's docket.

Any response to that submission by Ms. Kowalski shall be due by **August 23, 2024**. If she complies by August 23, 2024, the Court will consider whether to waive, or reduce any or all of Prudential's requested attorney's fees and costs. If Ms. Kowalski does not respond by **August 23, 2024**, either by complying or in response to the motion for attorney's fees and costs, Prudential will have until **August 30, 2024** to file a reply.

If by the time of Prudential's reply due **August 30, 2024**, Ms. Kowalski has not complied, the Court will hold a final in person compliance hearing, at the U.S. District courthouse, 141 Church Sreet, New Haven, CT 06510, in Courtroom 2, on **September 3, 2024 at 9:00 a.m.** At that time, Ms. Kowalski will be asked in open court whether she will comply immediately. If she is not able to comply immediately at that final compliance hearing, she will be remanded to the custody of the U.S. Marshals, and confined civilly until she decides to comply.[7]

**SO ORDERED** at New Haven, Connecticut this 30th day of July, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[7] If compliance has not been obtained by the September 3, 2024, hearing date, the Court will hold in abeyance Prudential's previous submissions for attorney's fees and costs, *see* ECF Nos. 315, 323 338, as well as any requests for attorney's fees submitted by Prudential on August 16, 2024.